UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                 :

J. CLAUDEL CAYEMITTES,             :

                       Plaintiff,    :

                                 :

        -v-               :

                                 :

THE CITY OF NEW YORK DEPARTMENT  :
OF HOUSING PRESERVATION AND     :
DEVELOPMENT,                  :

                                 :

                    Defendant.  :

                                 :
--------------------------------------------------------X

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: SEP 3 0 2013

No. 10 Civ. 8486 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

*Pro Se* Plaintiff J. Claudel Cayemittes brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., against The City of New York Department of Housing Preservation and Development ("HPD" or "Defendant"), the sole remaining Defendant in this action. Before the Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

## BACKGROUND

### A. The Summary Judgment Record

As is generally the case, the facts the Court has considered in connection with this motion derive from the evidence submitted by the parties and from their statements made pursuant to Local Civil Rule 56.1. Before the Court sets forth the factual background of this case, however, it finds it appropriate, in light of the voluminous and unconventional nature of Plaintiff's submissions, to first define with some precision the scope of its review and the materials upon which it has relied in connection with this motion.

### 1.  Plaintiff's Rule 56.1 Statements

Pursuant to Local Civil Rule 56.2 (requiring "Notice to Pro Se Litigant Who Opposes a Summary Judgment") Defendant timely advised Plaintiff of the procedures governing summary judgment submissions, including that Plaintiff "may [not] oppose summary judgment simply by relying upon the allegations in [his] amended complaint" and that "[a]ny witness statements must be in the form of affidavits . . . [and] based on personal knowledge stating facts that would be admissible in evidence at trial."  (Dkt. 51.)  Defendant also timely provided Plaintiff with copies of the text of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1.  Plaintiff was therefore adequately notified that "[e]ach statement by the . . . opponent pursuant to Rule 56.1([b]), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(c)."  Local Civ. R. 56.1(d).

Plaintiff has filed two 56.1 Statements that do not comply with these rules.[1]

The first of these submissions, which responds to Defendant's 56.1 Statement, is properly comprised of a list of numbered paragraphs each of which  "concede[s]" or "dispute[s]," as the case may be, the fact contained in the corresponding numbered paragraph in Defendant's submission.  Regardless of whether a fact is conceded or disputed, however, Plaintiff proceeds to add, in a majority of these paragraphs, a supply of additional facts that are unsupported by admissible record evidence.  See, e.g., Pl.'s 56.1 ¶¶ 18, 21, 30-33, 57.  Additionally, many of these "facts" are, inter alia: speculative, see, e.g., id. ¶ 58 ("Neither Carbine [n]or Hendrickson understood [P]laintiff's job as director of TPT/TLS."); conclusory, see, e.g., id. ¶ 47 ("By late February 2008, [P]laintiff had already been subjected to several retaliatory actions by Carbine for

---

[1]     For convenience, the Court will refer to these documents collectively as "Plaintiff's 56.1 Statement" and cite to them collectively as "Pl.'s 56.1."

his complaints."); and/or argumentative, see, e.g., id. ¶ 82 ("At best this sounds like a glib take on the role of DAMP . . .").

Plaintiff's second 56.1 Statement consists, according to Plaintiff, of additional "material facts [that] are not in dispute."  (Pl.'s 56.1 p. 1.)  This submission, which runs a full sixty-eight pages, is not "short and concise" and is not organized into numbered paragraphs, as the Local Rule requires.  More fundamentally, it does not contain, for the most part, facts corroborated by admissible evidence, but rather, statements that are, *inter alia*: vague, see, e.g., Pl.'s 56.1 p. 52 (Carbine "made vague disparaging comments to others about [P]laintiff's job performance but [has] always been careful not to ever give specifics or provide any proof."); conclusory, see, e.g., id. p. 7 ("Aragon decided to evaluate [P]laintiff . . . in order to retaliate against plaintiff . . ."); speculative, see, e.g., id. p. 5 ("Carbine was not interested in learning the TPT or TLS programs"); relevant only to claims that (as explained below) have been dismissed as time-barred or otherwise legally insufficient, see, e.g., id. p. 51 ("In 2002 Aragon summoned plaintiff into his office and reprimanded him in error for something that plaintiff did not do."); and/or personal attacks see, e.g., id. p. 50 ("Since about 2005 HPD has had a cadre of morally corrupt managers who [are] shameless liars and cared only about their ego.").

Despite these various infirmities, acknowledging that the various procedural rules attendant to opposing summary judgment may be challenging or confusing for a *pro se* litigant, the Court has reviewed Plaintiff's submissions in their entirety and has done its best to separate the wheat from the chaff.  Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.").  Specifically, although Plaintiff has not submitted a declaration or other sworn statement in opposition to Defendant's motion, the Court will consider the unsworn

content in Plaintiff's 56.1 Statement, to the extent it is otherwise admissible.  In so doing, the Court relies on the assumption that Plaintiff would have testified to such content had he complied with the governing rules.  See Geldzahler v. New York Med. Coll., 746 F. Supp. 2d 618, 620 n.1 (S.D.N.Y. 2010) ("[D]espite [plaintiff] having received the 56.2 Notice, we take into account his status as a *pro se* litigant and will consider the unsworn statements in his 56.1 Response on the assumption that he would have testified to these statements in his Declaration."); Shah v. Kuwait Airways Corp., 653 F. Supp. 2d 499, 506 (S.D.N.Y. 2009) (Lynch, J.) ("[T]he Court will consider [plaintiff's] declaration, even though it is unsworn, on the assumption that, if its allegations were sufficient to raise an issue of fact, Shah would be given an opportunity to submit an affidavit in the proper form attesting to those allegations.").  By the same token, the Court has disregarded the content of Plaintiff's 56.1 Statements that it deems conclusory, speculative, irrelevant, argumentative, unsupported or otherwise inappropriate for consideration.  See Shortt v. Congregation KTI, No. 10 Civ. 2237 (ER), 2013 WL 142010, at *1 n.2 (S.D.N.Y. Jan. 9, 2013) ("[I]n analyzing the instant motion, the Court has disregarded averments in Plaintiff's 56.1 Response that are . . . not supported by citations to admissible evidence in the record . . . or that are improper legal arguments.").

### 2.  Plaintiff's Exhibits

Plaintiff has submitted over one thousand pages of emails, other contemporaneous documentation, transcripts of depositions he took and personal notes he apparently prepared in connection with this litigation.

The Court has reviewed and considered all of these materials.  It notes, however, that it has not always been able to link them to the portions of Plaintiff's 56.1 Statements they are ostensibly intended to support.  First, these materials have not been presented to the Court in any

logical or convenient manner.  Plaintiff has merely grouped together as "exhibits" documents that are only loosely thematically related, see, e.g., Pl.'s Ex. J ("Some Green Project [sic] that [P]laintiff worked on intermittently from about November 2007 to April 2008"), or have no substantive relationship to one another at all, see, e.g., Pl.'s Ex. L ("Various discovery items under heading of 'PL' for Plaintiff in Numerical Order").  Second, as noted above, Plaintiff's 56.1 Statement only intermittently cites to this documentation.  Third, where Plaintiff has included a citation, it is with few exceptions not a citation to the exhibit itself, but rather to a Bates number, to a unique numbering system Plaintiff has applied to certain documents or to a vague description of the document.  See, e.g., Pl.'s 56.1 ¶ 19 (citing to "Mackie ESCF"); id. ¶ 35 (citing to "outreach to Personnel in Nov. 2007"); id. p. 6 (citing to "notes to self"); id. p. 51 (citing to "John Spinelli letter where Aragon accused plaintiff of sabotaging his hiring of Spinelli"); id. p. 56 (citing to "Loans").  Finally, Plaintiff occasionally appears to have intended to cite to submitted material, but, perhaps inadvertently, has failed to include any cite at all.  See, e.g., id. p. 30 (citing to "See . . .").

In summary, in light of Plaintiff's *pro se* status, the Court has considered "the totality of the parties' submissions in identifying disputed material facts and will construe those disputed facts in plaintiff's favor as is appropriate on summary judgment."  Shah, 653 F. Supp. 2d at 501 n.1 (citing Merritt v. Shuttle, Inc., 245 F.3d 182, 186 (2d Cir. 2001)).

## B.  Factual Background

Plaintiff began working at HPD in September 1986 as a budget analyst responsible for communicating HPD's funding needs to the Office of Management and Budget ("OMB"), formulating written requests to OMB and obtaining ultimate approval for HPD's funding proposals.  (Def.'s 56.1 ¶¶ 1-2.)  In November 1999, Plaintiff became a "financial analyst"

assigned to the Third-Party Transfer Unit in the HPD division then known as the Division of Anti-Abandonment, which was subsequently renamed the Division of Neighborhood Preservation ("DNP").[2]  (Id. ¶ 3; Cayemittes Tr. 55.)

Also in November 1999, Plaintiff settled a race discrimination dispute with HPD arising from Plaintiff's removal from HPD's budget office.  (Rizvi Decl. Ex. P.)  Pursuant to a term of the settlement agreement (the "1999 Settlement"), Plaintiff was promoted to Director of the Third-Party Transfer Unit ("TPT"), which he agreed to because "it fit [his] plans for [his] career."  (Id.;  Cayemittes Tr. 41.)  In that capacity, he "was responsible for running the [TPT] program [and] implementing the law that authorized the program."  (Id. 42.)

As of July 2001, in addition to his role as Director of TPT, Plaintiff became Director of the Tax Lien Sale Unit ("TLS" or, with TPT, "TPT/TLS")[3]  (Def.'s 56.1 ¶ 12.)  As Director of

---

[2]      For convenience, the Court also use the abbreviation "DNP" to refer to the Division of Anti-Abandonment. As Plaintiff testified, DNP was "geared to preventing abandonment, the whole history of abandonment that existed in the city by taking properties of nonpayment of taxes."  (Cayemittes Tr. 31-32.)

For the reader's benefit, the Court notes that, according to the DNP website, "[DNP] conducts site assessments of thousands of buildings each year through four borough offices to determine whether they are at risk, develop individual treatment plans for the buildings, and coordinate the implementation of the treatment plans. DNP[']s activities encourage owners to pay their taxes, refer owners to education and support programs including anti-abandonment training and provide assistance with rehabilitation loan financing, refer buildings for targeted code enforcement when necessary, and review distressed properties for exclusion from Department of Finance tax lien sales. DNP also coordinates several stages of the third party transfer process to convey distressed tax delinquent buildings to new responsible owners using an in rem foreclosure mechanism. Finally, DNP oversees the work of Neighborhood Preservation Consultants who extend DNP[']s reach into communities throughout New York City by providing a variety of housing services."  See  http://www.nyc.gov/html/hpd/html/about/neighborhood-preservation.shtml.

[3]      During the 1970's, New York City developed a substantial abandonment and vacancy problem. Both national and local economic trends made it more difficult for property owners to pay taxes. In 1976, the City responded to this crisis by assuming ownership of properties with one year of delinquent taxes through in rem foreclosure actions. The objective was to quickly prevent housing stock from further deteriorating under landlords who maintained poor conditions for their tenants. By the early 1990s, however, HPD had become the City's largest landlord, spending $2.2 million to manage, repair, and sell each building. In 1996, the City enacted a local law that enabled it to collect tax revenue upfront by selling liens on unpaid property taxes and related charges.  (Pl.'s Ex. C (*The New York City Tax Lien Sale: History and Impact* (May 2012).)

As Plaintiff testified, "[t]he tax lien sale is basically where we sell the lien against the property usually for nonpayment of taxes and then whoever the lien holder [is] can foreclose and ultimately take away the property." (Cayemittes Tr. 46.)

TPT/TLS, Plaintiff, *inter alia*, "managed HPD's tax lien sale work in coordination with [other City agencies]," worked with these agencies to "initiate several program improvements and innovations" and fielded "calls from City elected officials . . . in affected districts," and "represented HPD in negotiations with owner representatives in [c]ourt."   (Pl.'s 56.1 pp. 2-3.) During the relevant period, he "report[ed] directly" to the Assistant Commissioner of DNP, William Carbine.  (Rizvi Aff. Ex. D; Pl.'s 56.1 p. 2; Carbine Tr. 10-11.)

As Director of TPT/TLS, Plaintiff did not receive any complaints about his "job performance, lack of cooperation or teamwork" and Carbine "never formally or informally complained to [Plaintiff] about any aspect of his job performance." (Pl.'s 56.1 pp. 4, 9.)  Rather, Plaintiff received positive feedback for his management of TPT/TLS from "[m]ore than one Commissioner" and "other tax enforcement and anti-abandonment stakeholders" who "complimented [P]laintiff about the program intelligence he . . . provided." (Id. pp. 4-5.) Indeed, Carbine "often profusely praised [P]laintiff's work, especially before meetings with senior officials" and "told [P]laintiff that he was an outstanding administrator and a highly professional and excellent manager." (Id. pp. 9, 10.)

### *DNP Reorganizes and Plaintiff Becomes Director of Special Projects*

In fall 2007, DNP underwent a "reassignment process" to address numerous "[p]ersonnel" and "supervisory issues" throughout the "whole division," including certain issues relating to Plaintiff.  (Carbine Tr. 62-66, 103.)  As a result of the reassignment process, five of the six DNP directors, including Plaintiff, were rotated to different units "[t]o give a new fresh start to DNP"; "[n]obody was being singled out." (Id. 63-71, 101-2.)  Plaintiff describes this process as a "reshuffling." (Pl.'s 56.1 ¶ 13.)

In an October 1, 2007 meeting, Carbine informed Plaintiff that, due to the reassignment,

he would be removed from his position as Director of TPT/TLS and would become DNP's

Director of Special Projects.  (Rizvi Decl. Ex. H.)  Later that day, Plaintiff reacted to this news in

an email to Carbine, stating:

> I wanted to be clear about what you discussed w/me this afternoon: Due to a divisional reorganization, you said, there will be a "Round-Robbin" [sic] type set-up where "everybody gets moved around" to perform different jobs.  Under this arrangement, within three weeks, I will no longer be in my current position. Instead I am being reassigned as the new Director of Special Projects, which, I learned at the meeting, is the title currently occupied by Harriet Martin.
>
> My new responsibilities will entail working on the new, upcoming Neighborhood Consultants RFP . . . I will also be assigned to work on the "Green Project" where "everything has to be green" and . . . on "other smaller projects."
>
> For now, I have these questions: How long is this "Round Robbin" [sic] to last? Why am I being taken from a position I have been effective performing over the years and quite happy doing?  You mentioned that there are problems in my unit. Other than [one issue] that we have discussed over the past year, I have not been aware of any problems, especially anything else that impacts the unit's production.  My group has worked productively and harmoniously as a team since 2000.  Will I be informed what these "problems" are as well be given an opportunity to fairly address?  What does this mean to me and my career?
>
> As I explained, given a choice I would prefer a position where the job and its responsibilities are more clearly defined and in line w/[]my career goals.

(Id.)

As part of his reassignment to Director of Special Projects, Plaintiff "lost [his]

supervisory role."  (Cayemittes Tr. 53; Carbine 96-97.)[4]  He also believed the reassignment

signified a loss of "status" and constituted a "demotion."  (Cayemittes Tr. 53; Pl.'s 56.1 p. 14.)

He went from an "administrative, managerial, supervisory and high prestige position to one that

was less desirable."  (Pl.'s 56.1 p. 16.)

On October 1, 2007, Carbine told Plaintiff that his "removal from TPT/TLS would

---

[4]        As Carbine noted, and as discussed in detail below, Plaintiff was offered, but declined to accept, other director-level supervisory positions.  (Carbine Tr. 98.)

continue as planned" but would be "postponed another few weeks." (Id. p. 14.)  Plaintiff

responded by telling Carbine that he intended to "complain about his removal up the City

hierarchy." (Id. p. 16.)[5]

***HPD's Search for Positions of Interest for Plaintiff***

On October 11, 2007, Plaintiff met with Carbine and David Schmid, DNP's Director of

Operations, (Cayemittes Tr. 56), to discuss Plaintiff's new role as Director of Special Projects.

(Pl.'s Ex. O D002793.)  Schmid documented the meeting as follows:

> [Plaintiff] stated that he did not want to appear unreasonable by dismissing the
> offer [for the position of Director of Special Projects], but did not want to work in
> OPS [Office of Preservation Services] if given a choice.  He was told that the
> other directors who are being switched have not been given a choice on
> placement, but [Plaintiff] was granted time to make a decision on whether he
> would willingly accept the position.  In the meantime, [Carbine] offered to reach
> out to help [Plaintiff] find another position, if [Plaintiff] would tell him what he
> was interested in.  [Plaintiff] stated that he was unsure, but that he had previously
> mentioned working in Development.

(Pl. Ex. O. at D002793.)  This conversation is consistent with other extensive record evidence

indicating that, following Plaintiff's reassignment to the Director of Special Projects position,

Carbine and others sought to find Plaintiff other positions at HPD:

- On October 12, 2007, Carbine offered Plaintiff the directorship position of the DNP
  Queens Borough Office.  (Rizvi Decl. Ex. K.)  In an email of the same date, Plaintiff
  responded to the offer, stating: "Thank you Bill for this offer.  While I am appreciative
  and remain grateful for this and everything else that you have done, I have to decline.
  This is just not t[h]e direction I want to go at this point in my career." (Id.; Pl.'s 56.1 p.
  19.)

  Plaintiff emailed a colleague the same day, advising her that "[Carbine] . . . offered me
  the job running the Queens Office . . . I didn't want to appear difficult by dismissing that

---

[5]     Plaintiff testified that he recalled saying at the time, "wow this is what they must mean by
[g]errymandering, just to get rid of me which they have wanted to do for years," apparently referring to various past
supervisors and their reactions to the 1999 Settlement and a number of other incidents that, for reasons explained
below, are irrelevant to the instant motion. (Cayemittes Tr. 51-52.)  Shortly after his reassignment, Plaintiff also
"complained to HPD's internal [Equal Employment Opportunity] officer, Stanley Whing . . . about officials' plan to
remove him from his TPT and TLS programs, claiming retaliation" stemming from those same past incidents.  (Pl.'s
56.1 p. 19.)

outright, especially since I believe that it would be a demotion." (Pl. Ex. L P#21/1.) He later testified that the Queens offer was "almost insulting" and that he had been "warned that [it] was not legitimate and a possible set up, that he was being set up to fail and blame for the office's failings" and that "the decision had already been made to eventually close that office." (Cayemittes Tr. 101; Pl.'s 56.1 ¶ 40, p. 37.) Although Plaintiff does not state who "warned" him or how he learned of this alleged decision, he claims to have "been in Senior staff meetings where the lack of a workload in the [Queens] office was a recurring theme." (Cayemittes Tr. 112-113; Pl.'s 56.1 ¶ 40.) Plaintiff therefore viewed the Queens offer as an attempt to "get rid of him" because he was "a problem" and he hadn't "accepted fully their plan" to reorganize. (Cayemittes Tr. 101, 113.)

- On October 15, 2007, Carbine urged Plaintiff to contact Elaine Calos, the "Assistant Commissioner in charge of the of Preservation Finance . . . division within the Office of Development about a job in her area that was comparable to the TPT/TLS position." (Pl.'s 56.1 ¶ 47, p. 19.) Calos met with Plaintiff the same day and told him she would "see what position she could fashion in Finance for [P]laintiff, given his background and experience." (Id. p. 20.) In November 2007, however, Calos advised Plaintiff that "she could not find him the right position that was appropriate for him in Finance at the time." (Id. p. 22.)

- On October 23, 2007, Schmid recorded in an email another meeting he had that day with Carbine and Plaintiff, stating in part that they: "again met . . . to discuss [Plaintiff's] new projects and assisting with a transition phase. [Carbine] explained to Plaintiff that Preservation Finance was working to create a position for him, but that for the time being he was expected to start working on his new DNP projects [i.e., as Director of Special Projects] and provide transition assistance to the new TPT director when required. . . . [Plaintiff stated] that he was insulted by the job offer and . . . stated he would go to disciplinary." (Pl. Ex. O. at D002793.)

Plaintiff also memorialized the October 23, 2007 meeting in an email, stating: "Had a transitional meeting put on my calendar w/Bill.[] He began reading off a list [of] projects I will be assigned to.[] As of the latest, he said that he spoke w/DEV[elopment], 'they think they can find something for me but that it would [take] time to work something out[] a possible Dev job.' In the meantime I will be expected to cooperate w/the transition. I mentioned that my major concern at this point is my next job and my career, which is why I have been asking for this in writing [i.e., a description of Plaintiff's Director of Special Projects position] is s[o] that I can begin to have an appreciation of duties, expectations, etc. Bill said that I was approaching this all wrong and that people were trying to help me but that I was acting like a victim. He said that I was not making any sense that these jobs are legitimate assignments that will open up avenues for my career. I told him that one of the reasons I wish to have this in writing is so that I can make an analysis of how helpful this all really is to my career. He said that he was insulted!, that he was angry now and that this meeting was over, adding that 'you will see

these meetings . . . on your calendar.'" (Pl. Ex. P. D001946.)[6]

Despite these exchanges, Plaintiff maintains that he "in fact was not given any choice" as to DNP's late-2007 reorganization. (Pl.'s 56.1 p. 19.)

### Plaintiff's E-mail to HPD Commissioner Shaun Donovan

On December 3, 2007, Plaintiff sent a lengthy email to HPD Commissioner Shaun Donovan ("Donovan Email") regarding his reassignment. The Donovan Email stated in part:

> I was relieved of my position in the Third Party Transfer and Tax Lien Sale programs and relegated to a junior-level Director of Special Projects. The offered reason was "a big reorganization of the division's field offices to address the improprieties." Problems with communications are thrown in when explaining my removal. The available information though is that it was a coordinated taking away of a strategic job. My work is not field-based, and I am the only one who without cause is losing supervisory, managerial and administrative position and whose new role remains unclear . . . I believe the action . . . was retaliatory, race-based and because of my national origin.

(Rizvi Decl. Ex. N.) On January 13, 2008, Donovan responded, stating that he had "discussed this with a number of people and believe[d] it [wa]s something [Plaintiff] need[ed] to resolve directly with [his] supervisor." (Id.)

### Plaintiff's Work as Director of Special Projects

On October 24, 2007, Carbine met with Plaintiff to "continue a discussion about transition to his new responsibilities" as Director of Special Projects. (Pl. Ex. P D002632.) As

---

[6]    The record reflects that Plaintiff was also offered at least one other position elsewhere in HPD prior to his reassignment to Director of Special Projects. "In June 2007, Carbine offered [P]laintiff a position to run a field office in Brooklyn." (Pl.'s 56.1 p. 12.) Carbine recorded the offer in an email to himself, stating: "I offered a position as director of a new East Brooklyn Office for Neighborhood Services . . . to [Plaintiff]. The position would . . . involve setting up a new operation for implementing the new ideas we have for our field services and would involve a salary increase for [Plaintiff]. Unfortunately, he declined the offer." (Pl. Ex. P D002618.) Plaintiff explained that he declined the Brooklyn offer because he considered it "a demotion as it would have involved removing [him] as director of TPT/TLS with a net result of reduction of responsibility, jurisdiction, and authority." (Pl.'s 56.1 p. 12.) Plaintiff also viewed the Brooklyn offer as a "threat" that he "would be punished and sent somewhere to the North Pole if he did not leave his TPT/TLS work." (Id. p. 35.) He alleges that Carbine "offered the position to [Plaintiff] despite [his] having no interest or experience in doing that work because officials wanted to ease [him] out of his TPT/TLS position in favor of their friends." (Id. p. 12.) Plaintiff does not explain, as best the Court can discern, the basis for his statement as to these unnamed officials' motives.

Carbine recorded in an email, Plaintiff "mentioned that he would rather be transferred to some outpost of OPS, where he wouldn't have to do anything, but that he was a soldier and would do his new assignment under protest."  (Id.)

 Following another meeting with Plaintiff on October 30, 2007, Carbine emailed Schmid to report that:

> at our new regular one on one with Claudel, he said the following:  Wouldn't it be easier to transfer out somebody as difficult as me . . . I'm too dense to understand what you're asking me to do so put it in writing . . . This is not anything I'm interested in and I'm not as smart as you think I am, I don't understand, etc.
>
> We are reviewing his progress on several projects that I had previously explained to him in detail.  They are all important to the future of the division and, in my opinion, very interesting.

(Pl. Ex. P D002628.)

 The record reflects that Plaintiff was indeed tasked with several projects after he was reassigned.  The following summarizes the evidence relating to these projects, including Carbine's and Plaintiff's views as to Plaintiff's performance of them:

- "Loan Project": Plaintiff's first project in his new role was the so-called "Loan Project." (Pl.'s 56.1 p. 22), for which Plaintiff was required to "find out what's going on with the loan portfolios throughout the city at the different site offices and work with the development part of the agency and then try to come up with a loan product." (Cayemittes Tr. 74-75.)[7]  Carbine described the Loan Project as an "important," "tough" project, and he hoped Plaintiff "would be would be able to give it the attention it needed to bring it to the next level."  (Carbine Tr. 114.)  Plaintiff largely confirmed this sentiment, testifying that he was told that "no one has been able to do anything about loans for several years" and that "[i]f [he could] do something about loans . . . [he would] be a hero."  (Cayemittes Tr. 74.)

---

[7] As Carbine explained: "At the time the field offices that were under DNP had loan coordinators to each office.  They worked with the office of Development which had to underwrite and enclose the loans they worked together with them to try to get these loans to the finish line for the owner so they could do the repairs that were necessary.  It requires a lot of coordination and creativity, and you know pushing . . . Our loans are not necessarily the top priority for the development staff for a number of reasons, so we have to keep pushing them about them.  Also, our clients aren't that sophisticated so they need a lot of help to get the paperwork together and help them to understand how the loans are done.  Somebody really needs to pull all that together and you know . . . make sure it keeps moving and deal with everybody and meet regularly to get the loans done, and also be creative . . . the agency products don't really meet the needs of all the types of owners that we deal with, and so we like to think that we advocate for those owners and for those buildings and we need centrally to do that."  (Carbine Tr. 110-11.)

Plaintiff and Carbine disagree as to Plaintiff's performance on the Loan Project. Plaintiff's submissions detail extensively the work he did on the Project, discussing "key" "accomplishment[s]" and "milestone[s]," and attaching "samplings" of work he did in connection with it.  (Pl.'s 56.1 pp. 25-28.)  Plaintiff claims that Carbine told him he was "happy with the direction of the [P]roject" and that Plaintiff was "doing fine" with it, but then "began to ignore [P]laintiff's updates about the . . . project."  (Id. pp. 24, 26, 28.) Carbine, however, believed that Plaintiff "didn't really take [the Loan Project] on enthusiastically, which really meant you couldn't do what was required" and that Plaintiff "could have done more to produce the loan project."  (Carbine Tr. 112, 222.)  Carbine removed Plaintiff from the Loan Project in March 2008.  (Pl.'s 56.1 p. 29.)

- "Green Project": During the third week of November 2007, Plaintiff also began working on the "Green Project," an environmental initiative whereby Plaintiff was to make "everything . . . green" and to "come up with ways that [DNP] could promote energy efficiency, water savings, clean burning, et cetera.  (Cayemittes Tr. 82-84; Pl.'s 56.1 p. 22; Carbine Tr. 82.)

  Carbine testified that Plaintiff did not "embrace[]" the Green Project.  (Carbine Tr. 108.) Plaintiff maintains that the Green Project was a "'concept project' that was yet to be defined" and that Carbine accordingly directed Plaintiff to "take a relaxed, wait and see approach where he, Carbine, would be guiding next steps."  (Pl. 56.1 ¶ 37, pp. 22, 40.) Nonetheless, Plaintiff testified that he "start[ed] reading things" and "going online asking people" about similar initiatives.  (Cayemittes Tr. 83-84; Pl.'s Ex. J.)

- "Community Group Contracts Project": At some point in early 2008, Plaintiff was tasked with a so-called "Contracts assignment," for which his "charge" was "this new project . . . where we have all these contracts out there . . . that we don't know where things are and would like them in one table so that this information can be handy at meetings . . . especially with the groups."  (Pl.'s Ex. L #25 p. 12.)  Carbine described this project as "very important."  (Id. #4 p. 4.)

  On June 20, 2008, Carbine noted in an email to himself that "Unfortunately, Claudel showed almost no progress on his assignments at today's one-on-one.  The contract summary chart was incomplete and incorrect.  He asked the same questions he asks every week."  (Pl.'s Ex. O D003461.)  In an email the same day, Carbine removed Plaintiff from the Community Group Contracts Project "due to the slow progress [he] ha[d] made" and "reassigned" it.  (Pl.'s Ex. L. #4 p. 4.)  Plaintiff responded with a lengthy summary of the work he performed on the Project, to which Carbine replied, "You put more effort into this e-mail than you did on the assignment."  (Id. #4 p. 4.)

- "Planning Zones Project": Plaintiff was also tasked with collecting data for DNP "planning zones," which were apparently "crucial" for a new RFP.  (Pl.'s Ex. P. D003473; Pl's Ex. O D003461.)  In a May 23, 2008 email to himself, Carbine noted that Plaintiff had "made very limited efforts . . . to collect important data for the planning zones."  (Pl.'s Ex. P. D003473.)  In a similar June 20, 2008 email, Carbine further noted

13

that Plaintiff "has been unable to get the appropriate maps and . . . socio-economic data for the Division's planning zones." (Pl's Ex. O D003461.) In the June 20, 2008 email referenced in the entry above, Carbine demanded of Plaintiff that "[t]he calculation of CD [Community Development] eligibility in DNP Planning Zones must be complete . . . next week and you must make significant progress on the socio-economic research for these zones by the time I return from vacation." (Pl.'s Ex. L. #4 p. 3.)

- "Budget Books Project": In a May 2, 2008 email to himself, Carbine noted that Plaintiff "was given the assignment to update the budget briefing books for DNP on April 17. It was explained that the assignment was one of the highest importance and due on April 23. The update was not submitted by Claudel until April 28 and was not complete. David Schmid had to redo the update to make it appropriate for submission." (Pl. Ex. P D003472.)

  In an email to *him*self, also dated May 2, 2008, Plaintiff described the same conversation, as follows: "Had a 2 o'clock conference w/ [Carbine]. He said first that the Briefing document was late and not complete. I tried to explain that it wasn't before[.] [H]e said that that's (the issue of the assignment being late) not important anyway [sic]. He mentioned that he thought that I should be more communicative but did not elaborate what he meant and why he felt I was not being communicative. I did not wish to be called 'confrontational' so I said nothing . . ." (Pl.'s Ex. L #23 p. 74.)

- "Borough Consultations Project": As Carbine explained this Project: "Every year the community boards around the city . . . have an opportunity in the city's budget process to ask questions or ask for reports from different agencies . . . it's a very big operation and it goes a couple of weeks. We have to go to these meetings to answer questions. Prior to going to the meetings the questions are submitted and the answers are prepared and made into these books by the various agencies . . . it's quite a bit of work." (Carbine Tr. 253-54.) Carbine tasked Plaintiff with gathering the relevant information from various sources. (Pl.'s Ex. G D002152.)

  In an effort to gather the prepared answers, Plaintiff sent an August 8, 2008 email, attaching a "list of questions for the Queens Community Planning Boards," to various recipients asking them to "provide the portion of the attached that pertains to your area." (Id. D002151.) Carbine responded immediately to the email, stating: "Claudel, this is not the way to handle this. Please withdraw your e-mail immediately, read the questions, determine which are for DNP and call the relevant individuals for the information. Next write the answers and show them to me. Thank you for your cooperation." (Id.)

  Carbine viewed Plaintiff's email as "completely inappropriate" because Carbine "pushed the work off on others" including those "outside of D[N]P" some of whom were "high ranking." (Carbine Tr. 254.) Plaintiff, by contrast, contends that he had been sending similar emails "for several years" and "tried to perform this particular task in the exact same manner that . . . it had been successfully completed in the past by [P]laintiff and by others." (Pl.'s 56.1 p. 37, 43.)

On the whole, Carbine testified that Plaintiff was "not cooperative" following his reassignment and demonstrated a "resistance to . . . what needed to be done in that role." (Carbine Tr. 108-109.)  He described Plaintiff as "hostile" and made general reference to "some e-mails [that] got sent that were sarcastic about assignments."  (Id. 109.)  He testified that Plaintiff had ultimately "shown that [he] didn't want the job" by way of the "things that [he] said" and "how [he] took on the responsibilities or didn't take on the responsibilities."  (Id. 204.)

***Initial Discussions Regarding a Position in the Division of Alternative Management Program***

Sometime in late 2007, Anne-Marie Hendrickson, the Associate Commissioner of HPD's Division of Alternative Management Program ("DAMP"), and Carlecia Taylor, Hendrickson's Director of Operations, "had a need for some Senior Project Managers" in DAMP "who had a background in finance and real estate."  (Hendrickson Tr. 8.)[8]  Hendrickson therefore "started to ask around the agency to see if there were any people interested in coming to work for [her] and [Taylor]."  (Id. 8.)

Around this time, Hendrickson spoke to Carbine and learned that Plaintiff was a "potential [person] that would be available for [Taylor]" at DAMP.  (Id. 11.)  Carbine, who up until this point had been "actively looking for something for [Plaintiff]" responded that he thought Plaintiff would be a good fit for the DAMP position, (Carbine Tr. 193; Hendrickson Tr. 20), although Plaintiff claims, for reasons unclear, that "Carbine had known tha[t] [he] would not be interested in working at DAMP."  (Pl.'s 56.1 p. 32.)

In February 2008, Carbine told Plaintiff to reach out to Hendrickson.  Carbine testified that, although the DAMP job was not in development as Plaintiff had hoped,[9] "it involve[d] the

---

[8]     According to the DNP website, DAMP "encourages community growth by returning City-owned buildings to responsible private owners."  See http://www.nyc.gov/html/dof/html/property/property_tax_reduc_damp.shtml.

[9]     Around the same time, Carbine told Plaintiff to reach out to Holly Leicht, the Associate Commissioner of

redevelopment of property and underwriting et cetera" which was "[s]omething that [Plaintiff] had expressed to [Carbine] that he had an interest in." (Carbine Tr. 197.) Plaintiff, however, "had no intention of contacting [her] because he was not interested in work at her area." (Cayemittes Tr. 86-87; Pl.'s 56.1 ¶ 43, p. 47.) Hendrickson instead reached out to Plaintiff and told him, "I have your job for you." (Cayemittes Tr. 88.) Despite his professed disinterest, Plaintiff went to DAMP to "interview with her people." (Id.)

After speaking with Plaintiff, Hendrickson continued to believe he would be a good fit at DAMP because he was "good at follow up, . . . [and] had a pretty good real estate, and a pretty good finance background." (Hendrickson Tr. 28.) The open position there, Senior Project Manager, was, according to Hendrickson "an extremely important position" that "involve[d] getting buildings out of the city ownership" and "getting [them] rehabbed." (Id. 59.) In her view, the position was "just as important [a] position as director." (Id.) Although Hendrickson agreed that Plaintiff would not be reporting directly to her as Assistant Commissioner but rather to Taylor, she believed a transfer from Plaintiff's current position as Director of Special Projects would be a "lateral" move. (Id. 61.)

Plaintiff "doubts seriously" that his position in DNP and the open DAMP position "are even remotely similar" in part because "the position reports to a director of operations, and was not administrative, managerial, supervisory or prestigious, highly desirable position like the TPT/TLS position." (Pl.'s 56.1 ¶ 68, p. 63.)

Plaintiff claims Hendrickson told him he should transfer to DAMP because "they just d[id]n't want [him]" at DNP. (Pl.'s 56.1 p. 38.)

---

the Division of Development, where there was a "probability of another job." (Cayemittes Tr. 85-87.) Plaintiff testified that he "was definitely interested in the development [position]," but that "[g]iven what had transpired [presumably, his transfer to Director of Special Projects], [he] was suspicious of Carbine's motives" and "felt that Carbine only offered the possibility of a position in Development to stall plaintiff from going forward with his threat to complain up the hierarchy." (Id. 87; Pl.'s 56.1 ¶ 47.)

***Congratulatory Letter from Donovan***

On February 14, 2008, Donovan wrote Plaintiff a letter (cc'ing Carbine and others) in which he congratulated Plaintiff for receiving a commendation from a member of the public. (Rizvi Decl. Ex. O.)  The letter noted that Donovan had received "several" complimentary letters about Plaintiff from members of the public and thanked Plaintiff for "taking customer service to another level."  (Id.; Pl.'s 56.1 p. 8.)

When Plaintiff "wrote back to Donovan asking him about the other commendations that he mentioned in his letter," Carbine allegedly "told plaintiff that 'someone could easily interpret your letter to Shaun like you were harassing people.' 'What exactly are you trying to do?'" (Pl.'s 56.1 ¶ 52.)  The same day, Plaintiff claims that:

> an angry Carbine snapped at [P]laintiff and told him that he would stop signing for [him] half-hour lunches which [he] had arranged with his supervisors to address [his] long commute and baby-sitting needs.  When [P]laintiff protested and explained the purpose of the half-hour arrangement, a callous Carbine responded that he did not care what [P]laintiff did but that he will not sign for half-hour lunches . . . adding 'oh, yeah, you're off Green [Project] too.'  Carbine did not sign for [P]laintiff's half-hour lunch for the remainder of [P]laintiff's tenure in DNP, even though prior to February 14 Carbine and his predecessors all allowed [him] this benefit.

(Id. pp. 30-31.)

***Plaintiff's March 10, 2008 Email to Deputy Mayor Robert C. Lieber***

On March 10, 2008, Plaintiff sent a lengthy email to the Deputy Mayor for Economic Development, Robert C. Lieber ("Lieber Email").  (Rizvi Decl. Ex. P.)  In the Lieber Email, Plaintiff again complained that his transfer from his TPT/TLS position was, *inter alia*, "retaliatory, to damage [Plaintiff's] career and reputation, and because of [his] race and national origin."  (Id.)  Plaintiff explains that he emailed Lieber because "[f]ollowing Donovan's January 13, 2008 response to [his] complaints about unlawful discrimination and retaliation, the next step

up the corporate hierarchy was the deputy mayor, Donovan's direct supervisor."  (Pl.'s 56.1 ¶ 54.)  Plaintiff further testified that the reason he emailed Lieber was because he "was still complaining about being removed" from the TPT/TLS position and about being "assigned nothing of substance to further [his] career," so he "was going through the channels and then [he] had reached the deputy mayor."  (Cayemittes Tr. 93.)[10]

On March 27, 2008, HPD's internal Equal Employment Opportunity ("EEO") Officer Stanley Whing contacted Plaintiff regarding the Lieber Email and the two scheduled a meeting for April 1, 2008.  (Pl.'s 56.1 p. 45.)  When Plaintiff informed Carbine of his planned meeting with Whing, Carbine allegedly responded that "this complaining is not going to end well, Claudel."  (Id.)

***Further Discussions Regarding Plaintiff's Transfer to DAMP***

On April 4, 2008, Plaintiff and Taylor discussed his transferring to a position at DAMP. (Rizvi Decl. Ex. M.)  That discussion confirmed for Plaintiff that he was "not interested in the DAMP position [Taylor] discussed" but "out of consideration and courtesy [he] did not say that right then to her."  (Id.)  Specifically, according to Plaintiff, "the position she described was junior to what [Plaintiff had] done [at DNP] and that even people who worked under [him] had more responsibilities."  (Id.)  Taylor also apparently referred to the position as a "project/program manager" position and that, before considering Plaintiff, Taylor "had requested a Fellow to undertake it."  (Id.)  She also allegedly told Plaintiff that there "was no work" for him at DAMP "at his skill level" (i.e., that of a "high level professional[]").  (Pl.'s 56.1 p. 61.)

Later that afternoon, Carbine called Plaintiff into his office and told him "he understood that [Plaintiff] had accepted a position in DAMP and that effective in two weeks [Plaintiff

---

[10]     Plaintiff attached the Donovan Email, including Donovan's response, to the Lieber Email.  (Rizvi Decl. Ex. P.)

would] be leaving [Carbine's] division." (Rizvi Decl. Ex. M.)  Plaintiff responded that "this was

the first [he] heard of this" and described his earlier meeting with Taylor.  (Id.)  He and Carbine

then discussed "choice versus not having one" and Carbine "said that he wanted [Plaintiff] to

move to DAMP."  (Id.)  When Plaintiff "told him that [he] was not interested in the DAMP

position," Carbine said, "Okay, and that he would talk to [Hendrickson]."  (Id.)

    On April 7, 2008, after speaking with Hendrickson, Carbine called Plaintiff into his

office and "told [him he] had to go to DAMP."  (Id.; Pl.'s 56.1 p. 46.)  Plaintiff relayed the

foregoing to Whing in an email he sent that afternoon, concluding with the following:

> There are several areas inside HPD where I believe I can make a contribution.  I
> have not accepted a position in DAMP.  My being forced to go to DAMP at this
> point in this capacity is not a serious attempt to get work done.  Instead it is partly
> punishment of my recent letter to Deputy Mayor Lieber.

(Rizvi Decl. Ex. M.)

    The following afternoon, Plaintiff sent another, longer email to Whing, elaborating on his

employment situation.  He explained:

> For several months now, Bill Carbine has been trying to secure an appropriate
> position for me outside of OPS [Office of Preservation Services].  In our
> discussions about this I have been my interest in going [sic] to Development very
> clear.  TSD [presumably, Technology and Strategic Development] would be the
> other choice if the right opportunity became available.
>
> Last October I met w/[]Preservation Finance but there was no available fit.  Last
> February Bill [Carbine] again directed me to contact New Construction and
> Management and Disposition in connection with opportunities in those areas.  At
> the time I said nothing about Management and Disposition because I did not want
> to come off as ungrateful or in any[]way negative.  Before I could contact the
> managers, Associate Commissioner Hendrickson called me and told me she had a
> position for me . . . Following an interview w[] one of her managers, I received
> another call from her and I informed her that I was not interested in the position
> that her manager discussed w/me.  This all happened by the end of February.  On
> my reporting this to my supervisor he assured me that something better would
> become available.
>
> I eventually met w/New Construction on March 12th and from there met

w/Assistant Commissioner Walters on March 26th [but there was not] an appropriate position for my background, experience and level.  He mentioned the several other areas in Development where there are possibilities . . . he also mentioned opportunities he knew about in management and Disposition. . . .

Last week I heard back from Commissioner Hendrickson who advised she had another position that she wanted me to discuss w/her manager.  I met with [Taylor] on Friday, April 4.  We discussed a position in her area . . . The DAMP position described to me . . . is of absolutely no interest to me for several reasons.  Staff who have worked under me for example have had more substantive responsibilities.[11]

I was taken aback by the recent turn of events.  On Friday, Bill [Carbine] asserted that he had heard that I "accepted the DAMP position."  I then told him that was not true.  He then said that I had to report to DAMP. . . . When I made it clear . . . that I did not accept that DAMP job, he abruptly ended the meeting asking me if I was coming to work on Monday and Tuesday.  Yesterday morning, I was summoned to his office and [again] he repeated what he said Friday that I had to report to DAMP. . . . Earlier today I spoke w/Commissioner Hendrickson who said that I had to come to DAMP as the "paperwork" has ["]already started."  During our talk she cited that bill wanted to do me a favor . . . my not having any work to do in his division to her division where she has work for me.  How did it come that "I have no work" here in DNP?

(Id.)

On April 9, 2008, Deputy Commissioner of the Office of Preservation Services Luiz Aragon sent an email to Carbine noting that Plaintiff's DAMP transfer was put on hold.  (Rizvi Decl. Ex. Q.)

**_Plaintiff's Office of Equal Employment Opportunity Complaint and Subsequent Investigation_**

On April 10, 2008, Plaintiff filed an internal complaint with the HPD Office of Equal Employment Opportunity ("EEO") against Carbine alleging discriminatory treatment on the

---

[11]      On April 11, 2008, Taylor sent an email to Plaintiff attaching the job description for the DAMP Senior Project Manager position.  (Rizvi Decl. Ex. R.)  As stated in the job description, a Senior Project Manager works within DAMP's Interim Lease II ("TIL II") and Special Projects program areas.  (Id.)  Under the TIL II program, buildings are converted to tenant-owned cooperatives.  (Id.)  The job description Taylor sent further stated that: "The Senior Project Manager duties will include coordinating between [DAMP] . . . and the non[-]profit organization[] Urban Homesteaders Assistance Board . . . which is developing a large volume of buildings transitioning from city ownership into low income cooperatives.  Initially, the Senior Project Manager's primary responsibility will be facilitating the ongoing progress of projects in various stages." (Id.)

basis of race, color, national origin and retaliation in opposition to Plaintiff's past and current

EEO complaints (the "EEO Complaint").  (Rizvi Decl. Ex. T.)[12]  The following day, Whing sent

a memorandum notifying Carbine about the EEO Complaint.  (Rizvi Decl. Ex. U.)

Whing conducted an investigation into the EEO Complaint during which, he testified, he

"interviewed enough people to give [him] a good sense of what was going on" and "got an

understanding of the totality of the issues."  (Whing Tr. 27-28.)  On August 4, 2008, Whing

issued a report to Donovan for final review.  (Rizvi Decl. Ex. C.)  The report concluded that

Plaintiff's allegations were unsupported.  (Id.)   On August 18, 2008, Donovan approved

Whing's final determination, and Whing so notified the parties.  (Id.)

### Plaintiff's Ultimate Transfer to DAMP

Following the EEO Complaint, Plaintiff continued work as DNP's Director of Special

Projects.  (Cayemittes Tr. 114.)  As discussed above, during this time, Carbine lodged various

criticisms of Plaintiff's performance on these projects—for instance, his early-2008 criticism of

Plaintiff's work on the Loan Project (ultimately leading to Plaintiff's removal from that project),

his May 2008 critique of Plaintiff's work on the Budget Books Project and his June 2008

removal of Plaintiff from the Community Group Contracts Project.  Plaintiff also emphasizes

that, during this time, Carbine reprimanded Plaintiff for "working behind locked doors."  (Pl. Ex.

P D003474.)

Plaintiff was formally transferred to DAMP on September 15, 2008.  (Pl. Tr. 114; Rizvi

Decl. Ex. Y.)  Although his salary remained the same, Plaintiff was immensely dissatisfied with

his work there.  (Cayemittes Tr. 81, 145; Pl.'s 56.1 pp. 61-68.)  He testified that, on the "second

or third day" after his arrival, Taylor told him she had been "avoiding" him because DAMP did

---

[12]     Aragon was also named in the EEO Complaint in connection with conduct not relevant to this motion.
(Rizvi Decl. Ex. T.)

not "have any work" for him.  (Cayemittes Tr. 122.)    Indeed, Plaintiff states that he "spent several months—easily more than 90 percent of his time—in DAMP with nothing to do" and had "no work to do from September 2008 to November 2008."  (Pl.'s 56.1 pp. 66-67.)  Plaintiff states that at DAMP he was "ignored and isolated."  (Id. p. 64.)  Taylor allegedly "avoid[ed] him because she did not want to talk about work" and Plaintiff "had to rely on secretaries to find out what was going on."  (Id.)  "Attempts to find out where he stood were fruitless," Plaintiff claims, because "Hendrickson was never available."  (Id.)  This was "part of a coordinated effort on the part of DAMP officials . . . to frustrate [him] and continue to destroy his career."  (Id.)

In November 2008, Taylor's last day in DAMP,[13] she sent Plaintiff a new description of his job responsibilities, which he would conduct under the title of "Senior Policy Analyst" (Rizvi Decl. Ex. Z; Pl.'s 56.1 ¶ 83.)  Plaintiff states that he had no experience in any of the areas listed in the description and, in any event, he was "never given any work in DAMP that came close to any of the lofty job elements that Taylor sent to [him]."  (Pl.'s 56.1 ¶ 84, p. 65.)[14] Plaintiff asserts that he is now merely a "de facto project manager" at DAMP "reporting to very young people."  (Pl.'s 56.1 ¶ 81.)

## C.  Procedural History

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission against HPD ("EEOC Charge") on November 24, 2008.  (Rizvi Decl. Ex. AA.)

---

[13]      Following Taylor's departure, Plaintiff reported directly to Hendrickson.  (Cayemittes Tr. 121.)

[14]      The job description stated: "The Senior Policy analyst will oversee the evaluation, development, and/or implementation of housing programs designed to preserve and upgrade neighborhoods, or improve urban renewal areas or public and private housing.  The Senior Policy Analyst will provide counsel to the Director of Operations and Associate Commissioner of [DAMP] on a wide variety of housing policy and planning issues which require technical knowledge and authoritative interpretation of policies, legislation, regulations, and standards as applied to complex problems such as evaluating financial feasibility, tax policy, recommending text and policies for new programs, and other planning policy related matters."  (Rizvi Decl. Ex. Z.)  The parties do not dispute that Taylor had the discretion to change Plaintiff's position as a supervisor if she decided that it needed to be changed to meet DAMP needs.  (Def.'s 56.1 ¶ 85.)

Plaintiff alleged in the EEOC Charge that HPD discriminated against him on the bases of his race (African-American), color (black), national origin (Haitian), and unlawfully retaliated against him in violation of Title VII.  (Id.)  On August 12, 2010, the EEOC closed its file and issued Plaintiff a Right-to-Sue Letter, which stated that the EEOC was unable to conclude a violation had occurred.  (Id. Ex. BB.)

Plaintiff filed a *pro se* complaint in this Court on November 10, 2010, which he amended shortly thereafter on January 10, 2011.  (Dkts. 1, 5.)  His Amended Complaint asserts claims of discrimination and retaliation against HPD, Carbine and other of Plaintiff's supervisors pursuant to Title VII.  Plaintiff also asserted a claim for Intentional Infliction of Emotional Distress.  (Dkt. 5.)

On November 10, 2011, Magistrate Judge Theodore H. Katz issued a Report and Recommendation ("Report") recommending that U.S. District Judge George B. Daniels, to whom this case was previously assigned, dismiss Plaintiff's Amended Complaint in large part. (Dkt. 20.)  Specifically, the Report recommended the Court dismiss all Plaintiff's claims "except for his claim [against HPD] that in September 2008 he was transferred to the DAMP Division in retaliation for his 2008 EEO [C]omplaint."  (Report 16.)  In an Order dated February 9, 2012 ("February 9 Order"), Judge Daniels adopted the Report in its entirety.  (Dkt. 28.)

The Court's role, therefore, is to determine whether that remaining claim, broadly construed, survives summary judgment.  On review of the summary judgment record, the Court concludes it does not.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law,'" and "[a]n issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "A court reviewing a motion for summary judgment must 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"  Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003)).

In reviewing a motion for summary judgment involving a non-moving, *pro se* plaintiff, a court "liberally construe[s]" the materials submitted by the *pro se* litigant, "reading such submissions to raise the strongest arguments they suggest."  Bertin v. United States, 478 F.3d 489, 491 (2d Cir. 2007) (quotation marks omitted).  A plaintiff's *pro se* status, however, does not relieve him from the usual requirements of summary judgment.  Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003); Brown v. City of New York, No. 11 Civ. 6379 (KBF), 2013 WL 4713561, at *3 (S.D.N.Y. Aug. 27, 2013) ("[E]ven *pro se* plaintiffs must offer some evidence that would defeat a motion for summary judgment.").

## DISCUSSION

Title VII prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Title VII retaliation claims follow the familiar three-part burden-shifting analysis set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973):

> To make out a prima facie case of retaliation, a plaintiff must make four showings: that (1) [he] engaged in a protected activity; (2) [his] employer was aware of this activity; (3) the employer took adverse employment action against [him]; and (4) a causal connection exists between the alleged adverse action and the protected activity.  Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action.  If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation.

Summa v. Hofstra Univ., 708 F.3d 115, 125 (2d Cir. 2013) (internal citations and punctuation omitted).

The Court agrees with HPD that Plaintiff's retaliation claim falters at the prima facie stage.[15]

HPD does not expressly contest that Plaintiff has satisfied the first two prongs of his prima facie case.  Nor could it reasonably do so.  Plaintiff's EEO Complaint, filed on April 10, 2008, clearly constitutes participation in a protected activity.  Alston v. N.Y.C. Auth., 14 F. Supp. 2d 308, 311 (S.D.N.Y. 1998) ("Plaintiff's filing and maintenance of her internal EEO complaint certainly put the NYCTA on notice that she was engaged in statutorily protected activity.").  Plaintiff's December 3, 2007 Donovan Email and March 10, 2008 Lieber Email also constitute protected activities.  Hubbard v. Total Communications Inc., 347 F. App'x. 679, 681 (2d Cir. 2009) ("[An] informal complaint of discrimination is enough to satisfy the protected activity requirement under Title VII."); Kotcher v. Rosa & Sullivan Appliance Ctr., 957 F.2d 59,

---

[15]     HPD also moves to dismiss because it "is not a suable legal entity" and "may not be sued in its independent capacity."  (Mem. 25.)  HPD is correct.  See Bind v. City of New York, No. 08 Civ. 11105 (RJH), 2011 WL 4542897, at *20 (S.D.N.Y. Sept. 30, 2011) ("HPD itself is not a suable entity.") (quoting N.Y.C. Charter § 396).  Rather than dismiss the action on this basis, however, the Court finds it appropriate to construe Plaintiff's claims against HPD as having been brought against the City of New York, particularly in light of Plaintiff's *pro se* status.  Sanders v. N.Y.C. Dep't of Hous. Pres. & Dev., No. 09 Civ. 4054 (RMB), 2010 WL 3025651, at *1 n.1 (S.D.N.Y. July 28, 2010) ("Although HPD . . . [is] not [a] suable entit[y] under the New York City Charter, the Court construes Plaintiff's claims against [it] as being against the City."), aff'd, 470 F. App'x 1 (2d Cir. 2012).  For purposes of convenience and consistency, the Court has referred and will continue to refer to the Defendant as HPD.

65 (2d Cir. 1992) ("[A]n internal complaint to company management . . . is protected activity within the policies of Title VII.").  There is likewise no issue as to whether HPD knew of these protected activities.  Gordon v. N.Y. Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000) ("Neither [the Second Circuit] nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity.").

HPD does dispute, however, that Plaintiff can establish the third and fourth elements of his prima facie case—i.e., that he suffered an adverse employment action under circumstances giving rise to an inference of discrimination.  It is to these elements that the Court now turns.

### Adverse Action

The requirement of a materially adverse employment action reflects the principle that "Title VII does not protect an employee from 'all retaliation,' but only 'retaliation that produces an injury or harm.'"  Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 569 (2d Cir. 2011) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006)).   In Burlington Northern, the Supreme Court described a "material adverse action" as follows: "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  548 U.S. at 68.  Still, "[a]ctions that are 'trivial harms'—i.e., 'those petty slights or minor annoyances that often take place at work and that all employees experience'—are not materially adverse."  Tepperwien, 663 F.3d at 568 (quoting Burlington Northern, 548 U.S. at 68).  As the Second Circuit recently stated, in the summary judgment context, courts must be mindful that "material adversity is to be determined objectively, based on the reactions of a reasonable employee."  Rivera v. Rochester Genesee

Reg'l Transp. Auth., 702 F.3d 685, 698-99 (2d Cir. 2012) (citations and punctuation omitted).  It cautioned, however, that "context matters, as some actions may take on more or less significance depending on the context."  Id. at 699.

Plaintiff's primary arguments are that "(1) his transfer from Director of [TPT/TLS] to Director of Special Projects on about November 9, 2007 [and] (2) his transfer from DNP to little to no work and the ensuing confusion about what his title is in DAMP on September 15, 2008 . . . would dissuade a reasonable worker from making or supporting a charge of discrimination." (Opp'n 31.)

As to the first argument, Judge Daniels already concluded that a retaliation claim premised on Plaintiff's reassignment to Director of Special Projects in late-2007 was time-barred.  (February 9 Order 11.)  In any event, the argument fails on the merits.  Plaintiff was reassigned from the TPT/TLS position to the Special Projects position as part of a "rotation" or "reshuffling" involving five DNP directors.  After that process, Plaintiff remained within DNP, reported to the same supervisor (Carbine) and apparently received the same salary, evidence that indicates that Plaintiff's reassignment was nothing more than an alteration of his job responsibilities.  See Staff v. Pall Corp., 233 F. Supp. 2d 516, 533 (S.D.N.Y. 2002) (plaintiff's "transfer was but one part of a broad company reorganization which involved shifting tasks between different departments, and with that shift in tasks, a shift in the placement of certain employees.  Indeed, [plaintiff] was not the only employee transferred from R & D."), aff'd, 76 F. App'x 366 (2d Cir. 2003).

It is true, of course, that retaliatory transfers are "not limited to pecuniary emoluments," and can arise from a "discriminatorily-motivated diminution of duties."  Preda v. Nissho-Iwai Am. Corp., 128 F.3d 789, 791 (2d Cir. 1997) (citation omitted); see also Harris v. City of New

27

York, No. 03 Civ. 6167 (DLC), 2004 WL 2943101, at *4 (S.D.N.Y. Dec. 21, 2004) ("Lesser actions such as . . . a diminution in the complexity and prestige of work assignments, and transfers may also be considered adverse.").    But the only evidence that Plaintiff's responsibilities were diminished comes in the form of his own subjective view of his old position, which he was "quite happy" with, as compared to his new position, which was "less desirable" to him.   Plaintiff's own subjective dissatisfaction, however, is insufficient.  Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 209 (2d Cir. 2006) ("[T]he standard for assessing . . . a reassignment is an objective, rather than a subjective, one."); see also Johnson v. Eastchester Union Free Sch. Dist., 211 F. Supp. 2d 514, 518 (S.D.N.Y. 2002) ("Plaintiff's mere dissatisfaction with the transfer and his preference for his former position . . . are insufficient to constitute a materially adverse employment action."); Garber v. N.Y.C. Police Dep't, No. 95 Civ. 2516 (JFK), 1997 WL 525396, at *7 (S.D.N.Y. Aug. 22, 1997), aff'd, 159 F.3d 1346 (2d Cir. 1998) ("Plaintiff's dissatisfaction with the transfer, standing alone, does not support his claim of an adverse employment action.").   Considering Plaintiff's reassignment in context, the Court finds no evidence from which a reasonable juror could conclude that his new assignments as Director of Special Projects were objectively less complex or prestigious than his responsibilities in the TPT/TLS position.

The Court, however, agrees with Plaintiff that a jury could find that his transfer from Director of Special Projects in DNP to his position at DAMP—first as Senior Project Manager, then as Senior Policy Analyst—was materially adverse.  Upon his transfer to DAMP, Plaintiff no longer reported directly to the Assistant Commissioner—Hendrickson, Carbine's counterpart. He instead reported to Taylor, who in turn reported to Hendrickson.  It is fair to conclude from this evidence that Plaintiff's transfer to DAMP was not a "lateral" one as Hendrickson testified,

but was, at least structurally, a demotion.   A fact-finder could also reasonably conclude that,

upon arriving at DAMP, Plaintiff experienced a rather rapid diminution in the complexity and

prestige of his work assignments.   Despite the "lofty"-sounding position described to him,

Plaintiff would presumably testify that he was "never given any work in DAMP that came close"

to that description.   Indeed, crediting Plaintiff's statements that he "spent several months—easily

more than 90 percent of his time—in DAMP with nothing to do," had "no work to do from

September 2008 to November 2008," and now reports to "very young people," it appears that the

realities of the DAMP position were objectively inferior to the Director of Special Projects

position.   Accordingly, the Court concludes that Plaintiff's transfer to DAMP satisfies the third

prong of his prima facie case.[16]

---

[16]        In his opposition brief, Plaintiff lists a host of other actions he contends were materially adverse, including:
"final removal from [the Loan Project] . . . when [he] was making unprecedented progress towards officials' . . .
deadline, the decree not to allow [him] half-hour lunches, the decision not to assign [him] any meaningful
assignments, ignoring [P]laintiff's serious attempts to provide updates on his progress with the assignments he was
given . . . [and] Carbine['s] desperate charge that [P]laintiff somehow was violating some agency rule against
working with one's door closed when [P]laintiff never had his door closed."   (Opp'n 16-17.)   The Court disagrees
that any of these actions, viewed in the context of the summary judgment record as a whole, rise beyond the level of
those "trivial harms" that "often take place at work and that all employees experience" and that do not constitute
material adverse actions.   Tepperwien, 663 F.3d at 568; Oyewo v. Lahood, No. 10 Civ. 5139 (KNF), 2012 WL
996995, at *10 (S.D.N.Y. Mar. 26, 2012) ("The plaintiff's allegation that she was 'offered . . . obsolete
responsibilities,' without more, is not sufficient to sustain her burden of showing that she was denied meaningful
work and that the duties and responsibilities she had constitute an adverse employment action."), aff'd, 515 F. App'x
10 (2d Cir. 2013); McNutt v. Nasca, No. 1:10-cv-1301 MAD/RFT, 2013 WL 209469, *22 (N.D.N.Y. Jan. 17, 2013)
(supervisor's "ignoring" plaintiff not adverse action); Eugenio v. Walder, No. 06 Civ. 4928 (CS) (GAY), 2009 WL
1929311, at *26 (S.D.N.Y. Mar. 3, 2009) ("Reprimands and close monitoring are not adverse employment actions
under Title VII.").

        As to Carbine's "decree not to allow [Plaintiff] half-hour lunches," "[w]hether a change in schedule
constitutes an adverse employment action depends on context."   Mugavero v. Arms Acres, Inc., No. 03 Civ. 05724
(PGG), 2009 WL 890063, at *10 (S.D.N.Y. Mar. 31, 2009) (citing Burlington Northern, 548 U.S. at 69).   Plaintiff
states, without elaboration, that he required half-hour lunches, which would allow him to leave work early, due to
his "long commute and baby-sitting needs."   This evidence alone is insufficient to create a factual issue as to
whether he suffered a material adverse action.   He provides little context for these statements, for instance any
indication that his schedule actually changed.   Further, his statement that, when he protested, "Carbine responded
that he did not care what [P]laintiff did" appears to indicate that Plaintiff was not actually adversely affected, even if
Carbine refused to officially sign off on Plaintiff's "half-hour arrangement."   Accordingly, the Court finds that,
without more, a jury could not find material adversity as to this assertion.   See Witkowich v. Holder, No. 05 Civ.
7756 (GBD), 2010 WL 1328364, at *3 (S.D.N.Y. Mar. 31, 2010) ("Plaintiff has not proffered any evidence to show
that this change in his official hours adversely affected him."), aff'd sub nom. Witkowich v. U.S. Marshals Serv.,
424 F. App'x 20 (2d Cir. 2011); Gelin v. Geithner, No. 06-cv-10176 (KMK), 2009 WL 804144, at *21 (S.D.N.Y.
Mar. 26, 2009) ("An employee's decision to report discriminatory behavior simply does not immunize him from

*Causation*

The Court agrees with HPD, however, that Plaintiff is unable to satisfy the final prong of

his prima facie case—i.e., that there exists a causal connection between his various protected

activities and his transfer to DAMP in September 2008.

It is well-settled that an adverse employment action cannot serve as the basis for a

retaliation claim if the action was set in motion before a plaintiff engaged in protected activity.

See Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) (no causation

where "progressive discipline" began prior to plaintiff's filing of EEOC charges); Tomasino v.

St. John's Univ., 476 F. App'x 923, 925 (2d Cir. 2012) ("[B]ecause the record is replete with

undisputed evidence that Defendant imposed progressive discipline against Tomasino well

---

those petty slights or minor annoyances that often take place at work and that all employees experience.  This is particularly true where, as here, Plaintiff has offered no evidence showing that he suffered any harm or injury as a result of these actions.") (citations and internal punctuation omitted), aff'd, 376 F. App'x 127 (2d Cir. 2010).

Finally, the Court declines to hold that Carbine's alleged comment in late-March 2008 that Plaintiff's "complaining is not going to end well," which Carbine purportedly made upon learning of Plaintiff's planned meeting with Whing, constitutes a materially adverse action.  As noted above, "context matters," Rivera, 702 F.3d at 699, and "[t]he Second Circuit has instructed that while the test [for material adversity] is an objective [one], it remains relevant whether the plaintiff himself was deterred from complaining."  Jantz v. Emblem Health, No. 10 Civ. 6076 (PKC), 2012 WL 370297, at *15 (S.D.N.Y. Feb. 6, 2012) (citing Tepperwien, 663 F.3d at 572).  The record reflects that Plaintiff sent multiple email complaints to Whing only days after Carbine's alleged comment and filed his EEO Complaint shortly thereafter on April 10, 2008.  Therefore, to the extent Carbine's somewhat ambiguous comment could be objectively viewed as threatening, Plaintiff was clearly undeterred by it.  See Patterson v. Xerox Corp., No. 10-cv-6097, 2012 WL 2155278, at *7 (W.D.N.Y. June 13, 2012) ("Even assuming that [plaintiff's supervisor's] motivation was retaliatory and considering this warning in connection with [the supervisor's] other conduct, this action does not rise to the level of materiality that would implicate the antiretaliation provisions of Title VII . . . Notably, it did not dissuade plaintiff from making several subsequent complaints regarding Peterson to the internal ethics helpline and the EEOC."); Smith v. NYC Health & Hosp. Corp., No. 10-CV-714 (RRM) (LB), 2013 WL 3013641, at *6 (E.D.N.Y. June 18, 2013) (intimidating incident "occurred prior to plaintiff's filing her EEOC charge and clearly did not dissuade her from making her charge of discrimination"); Bundschuh v. Inn on the Lake Hudson Hotels, LLC, 914 F. Supp. 2d 395, 407 (W.D.N.Y. 2012) (no material adversity where "Plaintiff attest[ed] that [supervisor's] actions did not dissuade her from making a number of subsequent complaints").  Nor does Carbine's vague and isolated statement suffice to "show retaliatory animus 'without resort to inference.'"  Redd v. N.Y.S Div. of Parole, 923 F. Supp. 2d 371, 386 (E.D.N.Y. 2012).  The Court therefore cannot conclude that this statement, made over five months before Plaintiff's transfer to DAMP and almost as long after that transfer was initially contemplated, constitutes direct evidence of retaliatory intent or otherwise has any material bearing on the causation analysis discussed below.  See Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1183 (2d Cir.1992) ("Direct evidence" is "evidence tending to show, without resort to inference, the existence of a fact in question."); see also Cardoso v. Robert Bosch Corp., 427 F.3d 429, 432 (7th Cir. 2005) ("Direct evidence is essentially an outright admission that a challenged action was undertaken for one of the forbidden reasons covered in Title VII.").

before September, an inference of discrimination will not arise based solely on the proximity between her complaint and termination."). "If an employer's conduct before and after an employee complaint is consistent, the post-complaint conduct is not retaliatory." Wright v. N.Y.C. Off-Track Betting Corp., No. 05 Civ. 9790 (WHP), 2008 WL 762196, at *5 (S.D.N.Y. Mar. 24, 2008); Lessambo v. PricewaterhouseCoopers, L.P., No. 08 Civ. 6272 (WHP), 2010 WL 3958787, at *13 (S.D.N.Y. Sept. 27, 2010) (no causal connection where poor performance reviews were issued before and after protected activity), aff'd, 451 F. App'x 57 (2d Cir. 2011); Webb v. Niagara Cnty., No. 11-cv-192S, 2012 WL 5499647, at *5 (W.D.N.Y. Nov. 12, 2012) ("[Plaintiff] offers no evidence suggesting that the denials [of overtime] which occurred after her complaint were in any way different from the pre-complaint denials, or that they were somehow related to the Division of Human Rights complaint. Without evidence of such a causal connection, this claim must also fail.").

It is undisputed that HPD's efforts to secure Plaintiff a position elsewhere within the agency were part of an extended process that began no later than October 2007, when Plaintiff voiced frustration about his reassignment within DNP, and ended nearly a year later when Plaintiff was ultimately transferred to DAMP. During this process, numerous other jobs were discussed—the DAMP position, of course, but also the Queens Borough Office position, the East Brooklyn Office for Neighborhood Services position, as well as potential opportunities in Preservation Finance, New Construction, Management and Disposition and Development—some of which materialized into concrete offers that Plaintiff rejected.

Plaintiff has admitted that this process was continuing and predated his protected activity when he emailed Whing in April 2008, stating "for several months now, Bill Carbine has been trying to secure an appropriate position for me." That admission undercuts the argument

Plaintiff made to Whing the day before, and makes again here, that Carbine's efforts to transfer Plaintiff were "punishment [for Plaintiff's] recent letter to Deputy Mayor Lieber."  Logically, then, those efforts could not have been "punishment" for the EEO Complaint filed a month later either.[17]  To find causation here merely because the extended period during which DNP worked to find Plaintiff a position of interest was punctuated by Plaintiff's various discrimination and retaliation complaints would permit a plaintiff, aware that his employer had plans for his undesirable transfer, to halt that process with a preemptive EEO filing.  An employer should not be required to put a previously-planned, legitimate employment decision on hold simply because an employee engaged in protected activity.

In any event, the Court agrees with HPD that "[e]ven assuming that the adverse action plaintiff complains of did not have its genesis before his March 10, 2008 [Lieber Email] and April 10, 2008 EEO Complaint, [P]laintiff still fails to establish temporal proximity between those activities and the transfer to DAMP on September 15, 2008."  (Mem. 8.)  "[D]istrict courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation."  See Murray v. Visiting Nurse Servs., 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (collecting cases); see also Adams v. Ellis, No. 09 Civ. 1329 (PKC), 2012 WL 693568, at *16 (S.D.N.Y. Mar. 2, 2012) ("[C]ase law in the Second Circuit and in this district often finds a limit at two or three months and almost universally disapproves longer time periods.").

---

[17]    Although it is unclear from the record whether Plaintiff sent the December 3, 2007 Donovan Email before or after Hendrickson and Carbine commenced discussions in late 2007 regarding a position for Plaintiff in DAMP, even if those discussions post-dated December 3, 2007, causation remains lacking in light of Carbine's efforts to secure Plaintiff several other positions of interest prior to the Donovan Email.  In any event, as discussed below, there is too great a temporal distance between the late-2007 Donovan Email and Plaintiff's late-2008 transfer to DAMP to establish the requisite causal connection.

The shortest temporal distance between Plaintiff's most recent protected activity (the April 2008 EEO Complaint) and his ultimate transfer to DAMP (in September 2008) is over five months. That is too long a time period as a matter of law and establishes an independent basis on which to reject Plaintiff's argument that a causal connection exists. McGinnis v. N.Y. Univ. Med. Ctr., No. 09 Civ. 6182 (RMB), 2012 WL 5512173, at *4 (S.D.N.Y. Nov. 14, 2012) ("Because Plaintiff's basis for her claim of retaliation is the timing between the filing of her complaint on July 9, 2009 and her termination on February 1, 2010 and because she was subject to an extensive period of progressive discipline prior to the filing of her complaint, she has failed to make out a prima facie case of retaliation.") (internal quotation marks omitted).

It may be true, as Defendant asserts, that Plaintiff's transfer was the result of its legitimate efforts to "secure an appropriate position for [Plaintiff]" outside of DNP. It may also be true, as Plaintiff asserts, that Carbine and others "just d[id]n't want [him]" at DNP and "forced" him to transfer. Those two truths would not be mutually exclusive. See Burlington Northern, 548 U.S. at 68 ("antipathy" is not actionable). Even if this is assumed, however, there has been no showing—by way of causal inference or otherwise—that Defendant's decision to transfer Plaintiff to DAMP was retaliatory such that there exists a factual issue for a jury to resolve.

Plaintiff's retaliation claim accordingly fails at the prima facie stage.

## CONCLUSION

For the reasons set forth above, HPD's motion for summary judgment is granted. The

Clerk of Court is respectfully directed to terminate item number fifty (50) on the docket and to

close this case.

SO ORDERED.

Dated:        September 30, 2013
              New York, New York

_____
Ronnie Abrams
United States District Judge

34